UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DONALD BROOKS | * | CIVIL ACTION NO. 17-8751 |
| | * | |
| VERSUS | * | SECTION: "E"(1) |
| | * | |
| NANCY A. BERRYHILL, ACTING | * | JUDGE SUSIE MORGAN |
| COMMISSIONER OF THE SOCIAL | * | |
| SECURITY ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************* | * | |

REPORT AND RECOMMENDATION

The plaintiff, Donald Brooks, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Act, 42 U.S.C. §§ 423, 1381. The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 19) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 20) be GRANTED.

**Procedural Background**

Mr. Brooks applied for SSI and DIB on February 12, 2014, asserting a disability onset date of November 30, 2012. He alleged the following illnesses, injuries, or conditions: "pain in left side, screws in elbow & hip, 2 rods in left leg, knee, shoulder, injuries from car accident."  On September 4, 2014, his claim was denied by the state agency. The Disability Determination Explanations for his DIB claim concluded that the medical evidence did not show that Mr. Brooks was disabled while he was entitled to disability benefits, which was determined to be June 30,

2011. (R. at 139). The Disability Determination Explanations for his SSI claim concluded that Mr. Brooks' "condition is not severe enough to keep [him] from working." (R. at 151).

Mr. Brooks obtained counsel and requested a hearing before an Administrative Law Judge ("ALJ"), which was held on January 11, 2016. A second hearing was held before the ALJ on April 18, 2016. On May 20, 2016, the ALJ issued an adverse decision. The Appeals Council denied review on July 11, 2017.

Mr. Brooks represents that after he exhausted his administrative remedies, he submitted a new application for Social Security benefits, which was granted with a disability onset date of July 24, 2017. Mr. Brooks states that the record for that application was substantially the same as the present record and that the Commissioner found that the combination of Mr. Brooks' impairments prevent him from maintaining substantial gainful employment.

Meanwhile, on September 7, 2017, Mr. Brooks filed a Complaint in federal court to review the Commissioner's May 20, 2016, decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 15, 16). The parties filed cross-motions for summary judgment. (Rec. Docs. 19, 20). Mr. Brooks is represented by counsel.

## **Evidence in the Record**

Disability Records

Mr. Brooks submitted a Function Report to the state agency in which he reported getting along "okay" with authority figures, handling stress "okay," and handling changes in routine "sometimes." R. at 312. He also reported having a good attention span and that he can understand spoken instructions "pretty well." R. at 311. He reported that he can only walk for short distances, stand for short periods, and use his hands on a limited basis. R. at 311. He also reported difficulties with bending, kneeling, crouching, crawling, and sitting for long periods. R. at 306. He reported

having pins in his elbow, screws in his hip, and rods in his leg. R. at 306. He said that "[a]ny strenuous movement causes great pain." R. at 306. He also reported that sleeping in one position causes pain that prevents him from sleeping for long periods. R. at 307.

The state agency conducted a face-to-face interview with Mr. Brooks. R .at 287. The interviewer, J. Jackson noted that Mr. Brooks had difficulty reading, sitting, standing, walking, and using his hands. R. at 288. Jackson further explained that Mr. Brooks "walked very slow," "had to take his time to stand up," and "moved a lot while sitting." R. at 288.

After review of his medical records, on September 4, 2014, the state disability examiner assessed Mr. Brooks' residual functional capacity and assigned the following limitations: occasionally lift 20 pounds, frequently lift 10 pounds, ability to stand or walk for 6 hours in an eight hour work day with normal breaks, ability to sit for 6 hours in an 8 hour work day with normal breaks, no limitations in pushing and pulling, and no visual limitations. R. at 149.

In advance of the first hearing, Mr. Brooks' case manager through Depaul USA's housing program for chronically homeless individuals submitted a letter regarding Mr. Brooks' condition. R. at 215. He reported working with Mr. Brooks since November 2015 and that his organization had documented that Mr. Brooks had been homeless since 2013. R. at 215. He reported that Mr. Brooks maintains personal hygiene and that he had never been intoxicated in the case manager's presence. R. at 215. He reported that Mr. Brooks suffers from mood swings, paranoia, disorganized thoughts, issues with his temper, and an inability to concentrate. R. at 215. He reported that Mr. Brooks seems completely incapable of remembering how to get from place to place. R. at 215.

The First Hearing

A hearing took place before the ALJ on January 11, 2018. R. at 73-75. Mr. Brooks was represented by counsel. R. at 75. Mr. Brooks testified that he lives in an apartment on his own. R.

at 89. Until the month before the hearing, though, he had been homeless. R. at 97. Mr. Brooks does not drive but uses the bus or gets rides to get around. R. at 90.

He quit school after eighth grade and began working. R. at 90-91. He said he left school because of his dyslexia. R. at 91. He said he cannot read very well, and he explained that he needed help when filling out the forms required for his disability application. R. at 91.

Mr. Brooks testified that he had not worked since 2008 or 2009. R. at 94-95. Before that time, he performed various jobs, including pipe mechanic; structural fitter; ship fitter; welder at chemical plants, paper mills, and shipyards; auto-mechanic; and as a rigger on pipe laying barges in the gulf. R. at 92-93, 120-21.

Mr. Brooks testified that the reason he cannot work is because of pain. R. at 95. He has pain in his entire left side, which he attributes to a car accident where his entire left side was crushed. R. at 95. He is left handed. R. at 95. He testified that he had been prescribed Neurontin, Ibuprofen, and muscle relaxers for the pain, but he only takes them when the pain becomes extreme. R. at 104. He said that the neurologist who performed his MRI a few months before the hearing had recommended physical therapy for his sciatic nerves, but he had not been to physical therapy. R. at 105-06. He has received hydrocortisone shots. R. at 106.

When asked how far he could walk, he said not very much, but added that he also experiences pain when he is not moving. R. at 107. He said he could sit for about 15- 20 minutes before needing to change positions. R. at 107. He said he could stand for about 15 minutes before needing to sit down. R. at 108. He said he can lift pots and pans around the house. R. at 108. He does chores around the house like sweeping and mopping but must do so in spurts. R. at 109. He can prepare his own food and feed himself. R. at 109. He can bathe himself but said that when he is in the shower, he will need to take a break and sit down. R. at 110.

Mr. Brooks described experiencing falls over the previous year. R. at 110. He said he would be standing "and the next thing I know I'm laying on the ground." R. at 110. He said this had occurred 10 to 15 times over the preceding year. R. at 110. Mr. Brooks described an incident where he lost consciousness while serving time in jail. R. at 99. He said the previous day he had been required to take medication that was not his. R. at 99. When he was walking to breakfast, he passed out and awoke in the back of an ambulance. R. at 99. He said that he was diagnosed as having had an allergic reaction to his Oxybenzene prescription and sleeping pills, but that the pharmacist at Central City Mental Health told him that there was no logical way that could have happened. R. at 99-100.

Mr. Brooks testified that he meets with a psychiatrist at Central City Mental Health for treatment of his mental health conditions. R. at 98. Mr. Brooks testified that following his car accident, his wife left him, and he began drinking heavily. R. at 100. He said his sober date was July 19, 1996. R. at 100-01. He said he was in control and had not had bouts of using alcohol again. R. at 101. Mr. Brooks testified that he can follow verbal instructions but struggles with written instructions. R. a 102. The ALJ asked if Mr. Brooks if he used any reminders to jog his memory, and he said he slows down, focuses, and tries to calm himself. R. at 101.

When asked if he gets along with other people, Mr. Brooks said he tries "but . . . everybody has their – how do we say it character traits." R. at 102. He said he did not have difficulty getting along with co-workers when he was working and that "[t]hey loved me." R. at 102. He said sometimes he gets frustrated when dealing with the general public. R. at 103. He described an incident where an individual in the park had asked him for a cigarette, and when he said no, the individual beat him up. R. at 103.

Mr. Brooks has macular degeneration in his left eye, and although he has reading glasses, he said he can hardly see anything out of his left eye. R. at 96. He said that he has not been able to afford another pair of his prescription reading glasses since his previous pair was stolen. R. a 97.

Mr. Brooks reported that he was not experiencing any symptoms from his diagnosis of Hepatitis C. R. at 112.

The Second Hearing

Following the January 2016 hearing, additional medical records were provided to the ALJ and Mr. Brooks underwent a psychological consultative evaluation. R. at 49. A second hearing took place before the ALJ on April 18, 2016. R. at 46-48. Mr. Brooks was represented by counsel. R. at 48. Through counsel, Mr. Brooks amended his disability onset date to February 12, 2014, the date of his application for benefits. R. at 49.

The ALJ and Mr. Brooks discussed his past work to identify whether Mr. Brooks had performed any positions that had not been raised at the first hearing. R. at 54-57. Mr. Brooks explained that he had worked as a frame carpenter and performed many aspects of construction work. R. at 56.

The ALJ asked Mr. Brooks whether he had continued drinking alcohol since he became sober. R. at 57. Mr. Brooks said that he quit drinking alcohol in 1995 and that since then, he drinks alcohol only occasionally or sporadically. R. at 57-58. He said he had not been intoxicated from drinking too much alcohol since 1995. R. at 58.

The ALJ and Mr. Brooks also discussed Mr. Brooks' physical condition. R. at 58. Mr. Brooks testified that since the prior hearing, he had been having issues with his arms and shoulders, which would get numb. R. at 59. He said his hands would also go to sleep, affecting his ability to hold on to things. R. at 60. He testified that he had started physical therapy. R. at 62.

Vocational expert Deborah Robichaux testified. R. at 64. She identified Mr. Brooks' past work as ship fitter helper, heavy exertion with SVP of 2; welder helper, heavy exertion with SVP of 2; rigger helper, heavy exertion with SVP of 4; construction laborer, very heavy exertion with SVP of 2; and day laborer, heavy exertion with SVP of 3.

The ALJ asked the vocational expert to consider a hypothetical person with Mr. Brooks' age, education, and past work, who is limited to light exertional level work with occasional climbing of ramps and stairs and no climbing of ladders, ropes, and scaffolds; occasional balancing and reaching overhead on the left dominant side; occasional pushing and pulling on the left side; no work requiring binocular vision; no exposure to extreme cold or heat or to dangerous machinery or heights; work requiring an ability to remember and carry out only simple one and two-step instructions and make simple work-related decisions; needing occasional reminders from a supervisor; an ability to handle occasional routine changes; and occasional interaction with the public, co-workers, and supervisors. R. at 67-68. The vocational expert testified that this person could not perform Mr. Brooks' past work. However, the person could engage in the following jobs: parking lot attendant, light exertion with SVP of 2 and 24,000 positions nationally; cleaner/housekeeper, light exertion with SVP of 2 and 137,080 positions nationally; and silver wrapper, light exertion with SVP of 1, and 107,065 positions nationally. R. at 68.

The ALJ asked the vocational expert to consider a second hypothetical with the additional limitations that the person could not lift more than ten pounds on the left dominant side, could not engage in any overhead reaching on the left side, and with chronic pain and deficits in concentration, persistence, or pace that would frequently render the person unable to complete a typical 40-hour work week on a regular basis. R. at 68. The vocational expert testified that such a person could not perform any work. R. at 69.

7

The ALJ asked the vocational expert to consider a hypothetical person, like the second, but without the last limitation regarding ability to complete a 40-hour work week. R. at 69. The vocational expert testified that this person would not be able to perform the silver wrapper position but could still do the parking lot attendant job. R. at 69. The person would probably have difficulty with the cleaner/housekeeper position. R. at 69.

The vocational expert testified that her testimony was consistent with the DOT. R. at 70.

Medical Evidence – Physical Impairments

The earliest medical record is a consultative examination performed on December 9, 2006, at the Mobile Family Healthcare Center in conjunction with an earlier application for disability benefits. R. at 344. Mr. Brooks experienced pain on motion of the left shoulder, left elbow, and left hip. R. at 344. He experienced tenderness to palpation over the left AC joint and about the left elbow. R. at 344-45. Dr. R. Eugene Bass recorded the following impressions: residuals of polytrauma, post-operative left shoulder, left elbow, left hip and IM rodding of left femur; and post traumatic arthritis. R. at 345.

While incarcerated on October 13, 2012, Mr. Brooks was admitted to the emergency room complaining of left elbow pain. R. at 675. He stated he was injured during precinct booking when his left arm was moved forcibly by the police while his finger prints were being taken. R. at 675-76. Upon examination, popping noises were heard on movement of the left shoulder joint, but otherwise Mr. Brooks had good range of motion in the left upper extremities. R. at 678. He had no tenderness, no redness, no deformity, intact sensation and motor function, and intact pulses. R. at 679. Upon review of the x-ray of his elbow, the radiologist noted that the fracture "appears healed with residual deformity." R. at 680. There was evidence of loosening, medial aspect of the

transverse K-wire. R. at 681. His x-rays were found to be without evidence of severe disease. R. at 678.

Mr. Brooks fell face first into a hole while riding his bicycle on April 3, 2014 and went to the emergency room for treatment the following day. R. at 350, 353. He complained of headache and dizziness and had multiple bruises and abrasions to the face. R. at 350. He also complained of face, neck, and back pain. R. at 351. Ice and aspirin provided no relief. R. at 351. Mr. Brooks reported that there was no drug use involved in the accident, but there was alcohol use involved. R. at 351. Upon musculoskeletal examination, Mr. Brooks had full range of motion, with lumbar and thoracic paraspinous muscle tenderness. R. at 352. A maxillofacial CT scan was performed and Dr. Garney Fendley noted an impression of acute, mildly displaced, comminuted left nasal bone fracture. R. at 354. A CT scan of the cervical spine was performed, and Dr. Fendley provided the following impression: no CT evidence for acute traumatic cervical spine injury; and moderate to severe multilevel degenerative disk disease with multilevel spondylosis, most pronounced on the left at C6-7. R. at 354-55. A CT scan of the head was performed, and Dr. Fendley noted an impression of no acute intracranial abnormalities and mild right frontal scalp swelling. R. at 355. An x-ray of the lumbar spine was performed, and Dr. Fendley noted an impression of no acute radiographic findings; and mild degenerative disk disease and facet arthrosis in the lower lumber spine. R. at 356. An x-ray of the pelvis was performed, and Dr. Fendley noted an impression of no evidence for acute traumatic pelvic injury; and left femoral ORIF (open reduction and internal fixation) changes partially visualized. R. at 356. An x-ray of the thoracic spine was performed, and Dr. Fendley noted an impression of no acute radiographic findings and minimal scoliosis. R. at 356. An x-ray of the chest was performed and Dr. Fendley noted an impression of no acute radiographic findings and chronic appearing left acromioclavicular separation. R. at 357. Mr.

9

Brooks was prescribed ketorolac for pain, cyclobenzaprine for muscle spasms, and tramadol-acetaminophen to be taken as needed. R. at 359.

On May 12, 2014, Mr. Brooks was seen by Dr. Joseph M. Kanter to establish primary care. R. at 369. Mr. Brooks reported chronic hip, back, leg, and arm pain, and that his pain worsens as the weather warms. R. at 369. No musculoskeletal abnormalities were noted. R. at 370. Dr. Kanter prescribed gabapentin and naproxen. R. at 369.

Mr. Brooks was transported to the emergency room on June 7, 2014, at around 2:00 a.m. by ambulance following an altercation where he was knocked down and his attackers "beat his face into the ground." R. at 683. He presented with intoxication and a head and left shoulder injury. R. at 687. He had decreased range of motion in his left shoulder along with tenderness and swelling. R. at 689. He was unsteady on his feet at 6:28 a.m., but by 1:20 pm., he ambulated with an even and steady gate. R. at 685-86. Upon examination, his left shoulder exhibited decreased range of motion, tenderness, bony tenderness, swelling, and deformity. R. at 689. Evaluation with CT scans and x-rays revealed nasal bone fracture only. R. at 691.

Mr. Brooks returned to Dr. Kanter on July 15, 2014, to review lab results. R. at 458. It was noted that Mr. Brooks' lumbago was well-controlled with Neurontin. R. at 458. He was also taking naproxen. R. at 458.

On August 5, 2014, Mr. Brooks returned to the emergency room, reporting that he had been attacked the previous night by an unknown assailant who hit him in the left eye with an unknown object. R. at 707. He said he had been knocked unconscious. R. at 709. Mr. Brooks complained of eye pain, blurry vision in his left eye, and a throbbing headache. R. at 707, 711. He was not experiencing double vision. R. at 712. He had some improvement in his headache after receiving a dose of Percocet. R. at 712.

A consultative examination was performed by Dr. Miljana Mandich on August 29, 2014. R. at 376. Dr. Mandich noted that Mr. Brooks was poorly groomed and had a strong smell of alcohol on his breath. R. at 376. However, Mr. Brooks did not show any obvious signs of intoxication. R. at 379. Mr. Brooks reported having been a heavy drinker until a few years earlier when he reduced from drinking a case of beer a day to a few beers a day. R. at 376. Dr. Mandich observed that Mr. Brooks ambulated without difficulty, without a limp or use of a cane. R. at 377. Dr. Mandich noted normal range of motion of the neck and back with no complaints. R. at 378. Mr. Brooks could walk on heels and toes and could squat and rise without support. R. at 378. He was unsteady with tandem walking. R. at 378. The straight leg raise test was negative bilaterally. R. at 378. Mr. Brooks had full range of motion in his shoulders. R. at 379.  Mr. Brooks had uncorrected visual acuity of 20/160 in the left eye and 20/125 on the right. R. at 378.  During the examination, Mr. Brooks exhibited adequate understanding, cooperation, concentration, attention and memory. R. at 379. Dr. Mandich diagnosed Mr. Brooks as follows: left clavicle, left elbow, left hip and femur fractures in motor vehicle accident in 1990 with no evidence of any functional limitations of those areas at this time; and alcohol abuse. R. at 379.

On September 29, 2014, Mr. Brooks presented to the Interim LSU Public Hospital for evaluation and management of a positive Hepatitis C antibody test. R. at 717. The following symptoms were noted: anorexia, dark urine, diarrhea, fatigue, headache, and weight loss. R. at 718. On November 10, 2014, he returned to the LSU Public Hospital for management of Hepatitis C. R. at 934. The following symptoms were noted: anorexia, fatigue, myalgias, and weight loss. R. at 934. His symptoms were noted to be stable. R. at 934.

Mr. Brooks presented at the LSU Public Hospital on March 4, 2015, complaining of hearing loss that he had been suffering for several years. R. at 964. An audiograph was ordered,

and Mr. Brooks returned to the LSU Public Hospital on April 22, 2015. R. at 973, 977. He reported better hearing in his right ear. R. at 973. A diagnosis was not possible based on the assessments performed. R. at 975.

Meanwhile, Mr. Brooks visited Dr. Kanter on March 19, 2015, for medication management. R. at 457. He reported a history of lumbago and complained of stomach pain with Neurontin. R. at 457. Neurontin was discontinued, and naproxen was continued. R. at 457.

Mr. Brooks returned to Dr. Kanter on April 28, 2015, complaining of hip pain for two days. R. at 455. He had normal gait and no tenderness to palpation. R. at 456. He had full and equal lower extremity sensation. R. at 456. He was assessed with sciatic neuritis. R. at 456. Gabapentin was discontinued and Robaxin was prescribed. R. at 457.

Mr. Brooks returned to see Dr. Kanter on May 21, 2015, complaining of sciatica pain. R. at 454. He was assessed with sciatic neuritis. R. at 455.  A CT scan of the lumbar spine was ordered, and Mr. Brooks was referred to a neurosurgeon. R. at 455. Gabapentin was escalated and Robaxin was discontinued. R. at 455.

On June 18, 2015, Mr. Brooks was admitted to the emergency department with a diagnosis of assault, injury of face, cut on face, and headache. R. at 475. He exhibited normal range of motion and no edema or tenderness. R. at 1010. Swelling and lacerations above the upper lip and inner upper lip were noted. R. at 1007. His wounds were repaired with sutures. R. at 1011. X-rays of the chest and CT scans of the head, cervical spine, and face were performed. R. at 1020-21. There was no acute intracranial hemorrhage or calvarial fracture of the head, no fracture in the face, no cervical spine fracture or dislocation, and no evidence of acute traumatic injury to the chest. R. at 1022-23. The CT scan of the cervical spine revealed moderate disc space narrowing at C5-C6 and

C6-C7 with spondylosis and moderate bilateral foraminal narrowing at C5-C6 and C6-C7. R. at 1023. Mr. Brooks had full movement in bilateral upper and lower extremities. R. at 1042.

Mr. Brooks saw Dr. Kanter on June 24, 2015, to have his sutures removed. R. at 984. The sutures were removed without difficulty. R. at 985. His mood was euthymic, and a mental status exam was normal. R. at 986.

On September 13, 2015, Mr. Brooks was transported to the emergency department by ambulance. R. at 426. He had been found hypotensive and confused at prison. R. at 427. He reported having been given the wrong medication the previous night. R. at 427. Upon arrival of the ambulance, Mr. Brooks had systolic blood pressure in the 50s. R. at 428. He was given fluids and had systolic blood pressure in the 90s when he was being examined at the hospital. R. at 428. Mr. Brooks was diagnosed with syncope and hypotension. R. at 428. He was negative for back pain or neck pain. R. at 429. Upon physical examination, he had normal range of motion in his musculoskeletal systems. R. at 429. A CT of the head was performed and included the following findings: focal area of parenchymal hypo attenuation within the white matter of the right frontal lobe that is more conspicuous than on the previous exam and may represent an age indeterminate infarct; mild generalized cerebral volume loss; and mild sequela chronic ischemic vascular disease. R. at 437. Dr. Mariam J. Ahmed recommended that Mr. Brooks' prescriptions of doxepin and Atarax be held for at least 24 hours and until he was no longer hypotensive because anti-depressants and anti-histamines are known to cause hypotension. R. at 438.

An echocardiogram with color flow Doppler was performed on September 14, 2015. R. at 556. Mr. Barnes had normal left and right ventricular systolic function but left ventricular diastolic dysfunction. R. at 556. The estimated PA systolic pressure was 29mmHG and mild tricuspid regurgitation was noted. R. at 556.

Mr. Brooks presented at the University Medical Center emergency room on September 19, 2015 complaining of pain and swelling in the left ankle. R. at 1056. He reported that he "walks 'a lot'". R. at 1056. He denied any recent trauma. R. at 1058. He exhibited normal range of motion with minimal swelling at the ankle and tenderness just above the lateral/medial malleolus. R. at 1058. He was able to bear weight. R. at 1058. He exhibited normal mood and affect. R. at 1058. An x-ray of the ankle was performed. R. at 1066. There was no evidence of acute fracture or dislocation, joint spaces were well maintained, soft tissues were radiologically normal, there was mild Achilles enthesopathy and plantar spurring. R. at 1066.

Mr. Brooks visited Dr. Kanter on September 22, 2015, for a check-up after his emergency room visit for ankle pain. R. at 983. It was noted that his x-rays showed a plantar bone spur but no acute fracture or dislocation. R. at 983. Mr. Brooks reported that his back pain was better with gabapentin. R. at 983. His left ankle was swollen, with no erythema, warmth, or lesions. R. at 984.

Mr. Brooks presented at the neurosurgery department of the University Medical Center on October 7, 2015, on referral for sciatica of the right side by Dr. Kanter. R. at 1081, 1084. He described pain from his back to his right left down to the knee, back of the thigh. R. at 1083. It was noted that he "curses routinely throughout the interview." R. at 1083. He had no weakness but reported numbness and paresthesias. R. at 1083.

Mr. Brooks visited Dr. Kanter on October 26, 2015, complaining of left foot edema. R. at 981. Dr. Kanter observed mild ankle edema, with no TTP/erythema. R. at 982. His mood was euthymic, and a mental status exam was normal. R. at 982. No depression was noted. R. at 1308.

Mr. Brooks returned the University Medical Center on November 4, 2015, for an MRI of the lumbar spine. R. at 1087-89. The MRI showed multilevel spondylotic changes, most prominent at L4-5 and L5-S1 with severe bilateral facet arthropathy and mild-moderate bilateral foraminal

narrowing at L5-S1. R. at 1089. T11-12 demonstrated circumferential disc bulge and bilateral facet arthropathy with mild thecal sac and mild-moderate bilateral foraminal narrowing. R. at 1089.

Mr. Brooks was seen by Dr. Kanter on November 17, 2015 for results of an MRI. R. at 980. Mr. Brooks reported his back pain was consistent with previous visits. R. at 980. He reported that gabapentin and naproxen help his pain but taken together they irritate his stomach. R. at 980. Dr. Kanter noted that the MRI revealed mild to moderate narrowing at L5-S1 and T11-12. R. at 980. Straight leg raise was normal bilaterally, and no sensory abnormalities were noted. R. at 981. Mr. Brooks was prescribed naproxen and Robaxin for symptom relief and ordered to continue omeprazole for GI protection. R. at 981. Lower extremity edema was noted, and Mr. Brooks was ordered to continue compression and elevation. R. at 981.

Mr. Brooks returned to the University Medical Center on November 18, 2015, complaining of flank pain and to discuss his MRI results. R. at 1095. The record notes that he "[d]enie[d] weakness or sensory changes. Pain with walking, sitting or any position."

No further records of physical impairments are contained in the record before the Commissioner.

Medical Evidence – Mental Impairments

On October 2, 2014, Mr. Brooks presented to the LSU Public Hospital with depression and anxiety. R. at 727. His insight and judgment were noted to be limited, and his cognition was noted to be impaired due to alcohol abuse. R. at 728. A depression assessment (PHQ-9) was performed and he scored 24. R. at 729. An anxiety assessment (GAD-7) was performed and he scored 21. R. at 729-30. He was diagnosed with alcohol abuse, anxiety disorder NOS, and depressive disorder NOS. R. at 730. His visit lasted two hours. R. at 727-31.

He returned to the LSU Public Hospital on October 20, 2014, for a psychiatric evaluation. R. at 733. His mental condition, assessment scores, and diagnosis were the same as on October 20, 2014. R. at 735-36. His visit lasted thirty minutes. R. at 733-37.

Mr. Brooks presented at the LSU Public Hospital for a follow up visit for complaints of depression and anxiety on November 17, 2014. R. at 949. Mental condition, depression and anxiety assessments, and diagnosis were the same as on October 2, 2014, and October 20, 2014. R. at 950-51. The visit lasted an hour. R. at 954-958.

Mr. Brooks began treating with doctors at the Metropolitan Human Services District Community Mental Health Center in March 2015. Licensed clinical social worker Julia Miller, examined Mr. Brooks on March 5, 2015, and diagnosed bipolar disorder and alcohol dependence. R. at 494. Mr. Brooks was homeless at the time and had been homeless for about a year. R. at 524. During her assessment, she noted his mood was irritable, depressed, and tense. R. at 526. She marked his judgment as "impaired." R. at 526. His thoughts were noted to be logical/coherent, but also rambling and racing. R. at 526. She assessed his current Global Assessment of Functioning ("GAF") score as 50. Miller also performed a LOCUS[1] assessment on March 5, 2015. R. at 529. She marked Mr. Brooks' risk of harm as moderate and his functional status as moderate. R. at 529. He did not have a diagnosable mental disorder that is commonly associated with higher levels of impairment. R. at 529.

On March 17, 2015, Mr. Brooks met with Dr. Eric Kramer and reported "I think I'm losing it." R. at 517. He complained of irritability, being overwhelmed by stressors, and having decreased focus and concentration. R. at 517. A mental status examination was performed. R. at 518. His mood was euthymic, his affect was appropriate, and his attitude was cooperative. R. at 518. His

---

[1] LOCUS stands for Level of Care Utilization System.

concentration, memory, intellect, insight, and judgment were fair. R. at 519. He was assessed with a GAF score of 55. Mr. Brooks was prescribed hydroxyzine pamoate and citalopram. R. at 520.

On June 15, 2015, Mr. Brooks met with Dr. Lori Gonzales-Qader and reported drinking and smoking a lot of marijuana to keep from being depressed. R. at 511. Dr. Gonzales-Qader noted that Mr. Brooks was loud, labile, irritable, angry, and laughing with racing thoughts and anxiety. R. at 511. A mental examination was performed. R. at 513. His affect was labile, his mood was dysphoric, depressed, anxious, agitated, angry, and irritable; his speech was loud and verbose; and his attitude was cooperative. R. at 513. His memory and intellect were fair, and his concentration, insight, and judgment were limited. R. at 514. His medication was changed from citalopram to oxcarbazepine. R. at 511. He was continued on hydroxyzine. R. at 511. He was diagnosed with bipolar disorder, most recent episode depressed, severe without psychotic features; and polysubstance dependence. R. at 514-515. He was assessed with a GAF score of 60. R. at 515.

Mr. Brooks returned to Dr. Gonzales-Qader on July 16, 2015. R. at 506. His medication was changed from hydroxyzine to doxepin. R. at 506. He was continued on oxcarbazepine. R. at 506. His affect was appropriate, his mood was euthymic, and his attitude was cooperative. R. at 507. His concentration, memory, intellect, insight, and judgment were fair. R. at 508. He was diagnosed with bipolar disorder, most recent episode depressed, severe without psychotic features; and polysubstance dependence. R. at 509. He was assessed with a GAF score of 65. R. at 504.

Mr. Brooks returned to Dr. Gonzales-Qader on September 16, 2015. R. at 501. He had no complaints regarding medication side effects. R. at 501. He reported he had been hospitalized for an allergy to doxepin and hydroxyzine. R. at 501. Dr. Gonzales-Qader put double question marks behind each medication in her notes. R. at 501. Mr. Brooks was noted as being loud, agitated, and labile. R. at 501. He was not sleeping. R. at 501. He agreed to restart oxcarbazepine and begin

17

Seroquel. R. at 501. A mental status examination was performed. R. at 502. His affect was labile, his mood was dysmorphic and agitated, his speech was loud and rapid, and his attitude was cooperative. R. at 502. His concentration, memory, and intellect were fair, but his insight and judgment were limited. R. at 503. He was diagnosed with bipolar disorder, most recent episode depressed, severe without psychotic features; and polysubstance dependence. R. at 504. He was assessed with a GAF score of 65. R. at 504.

He returned to Dr. Gonzales-Qader on October 19, 2015. He had no complaints regarding medications.  R. at 496. Diagnoses of severe bipolar disorder, current episode depressed, severe without psychotic features were noted. R. at 499. No medications were noted. R. at 499. A mental status examination was performed. R. at 497. Mr. Brooks demonstrated appropriate affect, euthymic mood, speech within normal limits, and a cooperative attitude. R. at 497. His concentration, memory, intellect, insight, and judgment were fair. R. at 498.

He returned to Dr. Gonzales-Qader on November 19, 2016. Diagnoses of bipolar depression severe, polysubstance dependence, chronic pain, history of multiple head injuries, history of CVA, no symptoms of depression, mania, or psychosis were noted. R. at 1330. He was sleeping and eating well. R. at 1330. He had no complaints of medication side-effects. R. at 1330. A mental status examination was performed. R. at 1331. Mr. Brooks had appropriate affect, euthymic mood, speech within normal limits, and a cooperative attitude. R. at 1331. His thought processes were logical, and his thought content was non-psychotic. R. at 1332. His concentration, memory, intellect, insight, and judgment were fair. R. at 1332. His prescriptions for oxcarbazepine and Seroquel were refilled. R. at 1333.

A psychiatric consultative examination was performed on March 4, 2016, by Dr. Donna M. Mancuso. R. at 1292. The ALJ had requested Dr. Mancuso to address the scope of Mr. Brooks'

impairment due to use of alcohol and/or illegal drugs. R. at 1292. Mr. Brooks reported that he was applying for disability benefits due to physical impairments. R. at 1293. He also reported confusion and anxiety and a diagnosis of depression, severe bipolar, and ADHD since childhood. R. at 1293. No supporting records were provided. R. at 1293. He reported drinking "socially," but was vague about the current amount at first. R. at 1293. He noted that he drinks "2 big beers twice a month" and that every now and then he medicates himself with 2 or 3 beers to sleep. R. at 1293. He reported 5 DWIs and said that in the past he had smoked pot, crack, and crystal meth and had used LSD and mushrooms. R. at 1293. He reported episodes of binge drinking with the intention to die. R. at 1293.

Mr. Brooks reported that his sleep was poor, that his appetite was "so-so," that his mood "was usually good since he was prescribed medication," and that he had anxiety only in certain situations. R. at 1294. Upon mental status examination, Mr. Brooks was overly talkative, but not pressured. R. at 1296. He was not "fidgety, agitated, or slowed." R. at 1296. His affect was appropriate and upbeat. R. at 1296. Memory was within normal limits for immediate memory. R. at 1297. Memory was "not within normal limits" for recent memory. R. at 1297. His concentration and attention were within normal limits. R. at 1297. His judgment and insight regarding seeking treatment was good, but his judgment and insight regarding alcohol use was poor. R. at 1297.

Dr. Mancuso opined that Mr. Brooks met the diagnostic criteria for unspecified bipolar disorder; alcohol use disorder, severe, in partial remission; stimulant use disorder, moderate, in reported remission; cannabis use disorder, moderate, in reported remission; stimulant use disorder, cocaine, moderate, in reported remission; history of specific learning disorder with impairment in reading; history of ADHD; rule out neurocognitive disorder, mild, due to cerebro-vascular accident

("CVA") and/or alcohol abuse. R. at 1297. She noted prognosis was guarded. R. at 1297. She concluded that Mr. Brooks cannot handle funds. R. at 1297.

Dr. Mancuso determined that Mr. Brooks' ability to relate to others would likely be fair if he remains on his medication. R. at 1298. She noted that, with his mood disturbance, he may have problems at times, especially if drinking alcohol. R. at 1298. Dr. Mancuso concluded that his ability to maintain attention and perform simple repetitive tasks for two-hour blocks of time would likely be fair. R. at 1298. She concluded that his ability to sustain effort and persist at a normal pace over the course of a routine 40-hour work week would likely be impaired. R. at 1298. Dr. Mancuso determined that Mr. Brooks' ability to understand, remember, and follow simple commands would likely be within normal limits. R. at 1298. His ability to tolerate the stress and pressure associated with day to day work activity and demands would likely be moderately impaired. R. at 1298.

Dr. Mancuso concluded that the use of substances may be a factor in worsening of the condition of recent memory impairment and mood disturbance. R. at 1298. She added that the recent CVA may also have impaired his recent memory. R. at 1298. She also noted that physical complaints impacted the condition. R. at 1298. She concluded that Mr. Brooks should receive ongoing psychiatric evaluation and management. R. at 1298.

In filling out a Social Security Administration Medical Source Statement, Dr. Mancuso reported that Mr. Mancuso's ability to understand and remember simple instructions, to carry out simple instructions, and to make judgments on simple work-related decisions was not affected by his impairment. R. at 1301. She determined that his ability to understand and remember complex instructions, to carry out complex instructions, and to make judgments on complex work-related decisions was mildly to moderately impaired. R. at 1301. Dr. Mancuso reported that Mr. Brooks'

ability to interact appropriately with supervisors, co-workers, and the public was not affected by his impairment. R. at 1302. Dr. Mancuso concluded that Mr. Brooks could not manage benefits in his own best interest. R. at 1301.

## Decision of the Administrative Law Judge

The ALJ first addressed Mr. Brooks' claim for DIB. The ALJ concluded that Mr. Brooks had acquired sufficient quarters of coverage to remain insured through June 30, 2011. Thus Mr. Brooks would have to establish disability on or before June 30, 2011, to be entitled to DIB. Pointing out that Mr. Brooks originally alleged disability onset date of November 30, 2012, and his amended onset date of February 12, 2014, the ALJ concluded that Mr. Brooks is not eligible for DIB.[2]

The ALJ next addressed Mr. Brooks' claim for SSI. The ALJ concluded that Mr. Brooks has not engaged in substantial gainful activity since November 30, 2012. The ALJ determined that Mr. Brooks has the following severe impairments: loss of central visual acuity/macular degeneration of the left eye; dysfunction of major joints; degenerative disc disease; bipolar disorder; and substance addiction disorders. The ALJ determined that Mr. Brooks did not have severe anxiety, hypertension, anemia, hepatitis C, tone deafness, or any other impairment besides than those enumerated as severe. The ALJ found that Mr. Brooks does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. part 404, Subpart P, Appendix 1. In making this determination, the ALJ considered Mr. Brooks' impairments using Section 1.02 (major dysfunction of a joint); Section 1.04 (disorders of the spine); Section 2.02 (loss of central visual acuity); Section 12.014 et seq. (mental), specifically 12.06 (anxiety related disorders) and 12.09 (substance addition disorders).

---

[2] Mr. Brooks does not challenge the dismissal of his application for DIB, and he has therefore abandoned his DIB claim.

Next the ALJ determined that Mr. Brooks has the residual functional capacity to perform light work, except that he can only occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance; occasionally reach overhead with the left upper extremity (dominant side); and occasionally push/pull and handle with the left upper extremity. He must also avoid exposures to extreme cold or heat and avoid exposure to dangerous machinery and unprotected heights. The work can never require binocular vision. He is also limited to understanding, remembering and carrying out simple 1 and 2 step instructions and making simple work-related decisions; he will need occasional reminders from supervisors; he can respond appropriately to occasional routine changes in the workplace; and he can have occasional interaction with the public, coworkers, and supervisors.

The ALJ next determined that Mr. Brooks is not able to perform any of his past relevant work. The ALJ classified Mr. Brooks as an individual "closely approaching advanced age," because he was 50 years old on the alleged disability onset date. The ALJ determined that Mr. Brooks had limited education and is able to communicate in English. The ALJ determined that the transferability of job skills was not material to the determination of disability because using the medical vocational rules as a framework supports a finding that the claimant is "not disabled" whether or not he has transferable job skills. The ALJ determined that considering Mr. Brooks' age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform. Thus, the ALJ concluded that Mr. Brooks has not been under a disability from February 14, 2014, through the date of decision on May 20, 2016.

<u>Statement of Issues on Appeal</u>

Issue No. 1.    Whether the ALJ erred in determining Mr. Brooks' residual functional capacity by not finding that the pain caused by Mr. Brooks' spinal stenosis and degenerative disc disease resulted in additional restrictions to Mr. Brooks' ability to work.

Issue No. 2.    Whether the ALJ erred in determining Mr. Brooks' residual functional capacity by failing to include limitations related to his ability to maintain acceptable pace or meet production requirements on a consistent basis over the course of a 40-hour work week as a result of his bipolar disorder.

<u>Analysis</u>

## I. <u>Standard of Review.</u>

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. <u>Perez v. Barnhart</u>, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence is more than "a mere scintilla," but less than a preponderance. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Hames v. Heckler</u>, 707 F.2d 162, 164 (5th Cir. 1983). Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. <u>Carey v. Apfel</u>, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's. <u>Perez</u>, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. <u>See</u> <u>Arkansas v. Oklahoma</u>, 503 U.S. 91, 113 (1992). Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988).

Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

**II.**    **Entitlement to Benefits under the Act.**

To be considered disabled under the Act, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." Id. Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. Id. An assessment of the claimant's residual functional capacity is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. Id.

III.    **Plaintiff's Appeal**.

Issue No. 1.    Whether the ALJ erred in determining Mr. Brooks' residual functional capacity by not finding that the pain caused by Mr. Brooks' spinal stenosis and degenerative disc disease resulted in additional restrictions to Mr. Brooks' ability to work.

"Pain, [may] constitute a non-exertional factor that limits the range of jobs an applicant can perform." Carter v. Heckler, 712 F.2d 137, 142 (5th Cir. 1983). "When pain is treated as a nonexertional factor, rather than as a separate ground for disability, it need only be shown to have significantly narrowed the spectrum of jobs within a particular exertional category for which the claimant would otherwise qualify." Dellolio v. Heckler, 705 F.2d 123, 127 (5th Cir. 1983) (internal citations omitted). Nonetheless, it remains "within [the ALJ's] discretion to determine the pain's disabling nature." Herrera v. Comm'r of Soc. Sec., 406 F. App'x 899, 905 (5th Cir. 2010) (quoting Wren v. Sullivan, 925 F.2d 123, 128 (5th Cir. 1991)) (alteration in original).

Mr. Brooks argues that the ALJ's decision is not supported by substantial evidence because the residual functional capacity analysis failed to address non-exertional limitations to persistence and pace resulting from chronic pain caused by Mr. Brooks' spinal stenosis, facet arthropathy, degenerative disc disease, bulging discs, and neurotic sciatica. He complains that the ALJ made only passing references to his pain and focused solely on the range of motion and strength limitations caused by his conditions without discussing any potential limitations to his pace or persistence.

Mr. Brooks cites Gobert v. Astrue, where the district court found the claimant's "severe impairments of chronic pain and depression and/or her medication side effects" resulted in "limitations of impaired concentration, focus and memory" that should have been included in the hypothetical presented to the vocational expert. No. 2:12-CV-02103, 2014 WL 31254, at *12 (W.D. La. Jan. 3, 2014). Evidence of chronic pain included the testimony of the claimant's

physician that the claimant "suffers from chronic pain, as demonstrated by the fact that she has been prescribed narcotics and muscle relaxers to take on a daily basis." Id. at *12. The claimant's physician also testified that the claimant's "severe impairments of chronic pain . . . and depression, as well as obesity, which, with her medications, limit her ability to work." Id. at *11. The physician further testified that "the medication side effects would impair her concentration, focus and memory." Id. at *11. Additionally, a psychologist testified that the claimant's "GAF score of 58 means that [the claimant] has moderate difficulty with concentration, focus, and memory." Id. The Court found that "the uncontradicted medical evidence, as well as [the claimant's] testimony, indicates that [the claimant] has moderate limitations in her concentration, focus and memory." Id. The court observed that "the ALJ included all of the limitations that the medical expert . . . testified would restrict [the claimant's] ability to work, given her severe impairments of morbid obesity, chronic pain, and depression, except for [the claimant's] medication side effects of impaired concentration, focus and memory." Id. The court held that the ALJ erred in "rejecting the opinions of the medical experts and substituting his own non-expert opinion as to the severity of [the claimant's] impairments." Id.

Mr. Brooks insists that the medical records show that his pain conditions have worsened over time. Although his sciatic and lumbar pain was controlled with Neurontin in July 2014 (around the time of the consultative examination with Dr. Mandich in August 2014), he points out that by March 2015, Neurontin was discontinued because of side effects, and he was prescribed naproxen instead. He says his doctors have not found another medication to control his severe pain symptoms. He points out that in April 2015, he complained of worsening lumbar pain. In May 2015, he reported his sciatica was unrelieved by NSAIDS and Robaxin, and he was put back on gabapentin (generic of Neurontin). Mr. Brooks admits that his records show that by September

2015, he reported his back pain was better with gabapentin. R. at 983. But he says his pain returned two weeks later, citing the record of his visit to the neurologist on October 7, 2015. Mr. Brooks also points to his November 2015 visit with Dr. Kanter as evidence of continued back pain and associated numbness and paresthesias. But the Court notes that at that visit, Mr. Brooks also reported that gabapentin and naproxen help his pain. R. at 980. Although he noted at that time that taken together they irritate his stomach, Dr. Kanter ordered omeprazole for GI protection. R. at 981.

The government responds that despite Mr. Brooks' allegations of pain, physical examinations consistently revealed normal muscle tone, strength, coordination, sensation, gait, station, and range of motion. Normal gait was noted in April 2015, normal strength was noted in May 2015, and normal range of motion was noted in April 2014, June 2015, and September 2015. The government argues that additional restrictions due to pain are not warranted because his complaints are not supported by the evidence. The government insists that the residual functional capacity assessment greatly restricts Mr. Brooks by limiting him to light work with many additional limitations.

In assessing Mr. Brooks' pain, the ALJ noted his testimony that he could not work due to arthritis and back pain. The ALJ also noted that Mr. Brooks admitted that medication provides pain relief, although Mr. Brooks has not always had access to medication. In reviewing the records of Mr. Brooks' October 2015 appointment with the neurosurgeon (where Mr. Brooks complained of pain from the back of his right leg down to the knee and back thigh), the ALJ noted that treatment was conservative and limited to prescription of muscle relaxers and a recommendation for physical therapy treatment. In considering Mr. Brooks' treatment with Dr. Kanter for back pain, the ALJ

27

noted consistently normal findings on musculoskeletal physical exam including full strength and full sensation.

Although Mr. Brooks insists that he suffers limitations to persistence and pace due to his pain, he fails to point to medical evidence supporting such an effect. Unlike the Gobert case, where the claimant's treating physician testified that the claimant's impairments of chronic pain, depression, and obesity, along with her medications, limit her ability to work, there is no opinion of a consultative examiner or treating physician that Mr. Brooks is limited by pain. Nor is there evidence, as there was in Gobert, that Mr. Brooks' medication's side effects impair his concentration, focus, and memory. Mr. Brooks testified that he cannot work because of pain, but he did not testify or report in his disability application or to his physicians that his pain or medication affected his ability to focus, concentrate, remember things, or sustain tasks. As a result, the ALJ had no basis on which to determine that Mr. Brooks' pain impedes his pace and ability to persist; and certainly, there is no evidence to support Mr. Brooks' claim that the ALJ erred in failing to find pace and persistence restrictions resulting from pain. The ALJ considered Mr. Brooks' back impairments and incorporated limitations like light work and occasional climbing of stairs and ramps. The Court finds that the ALJ's residual functional capacity assessment as to the limitations to be imposed as a result of his back conditions is supported by substantial evidence.

Issue No. 2.    Whether the ALJ erred in determining Mr. Brooks' residual functional capacity by failing to include limitations related to his ability to maintain acceptable pace or meet production requirements on a consistent basis over the course of a 40-hour work week as a result of his bipolar disorder.

At Steps 2 and 3 of the analysis, the ALJ determined that Mr. Brooks' bipolar disorder was a severe impairment that caused moderate limitations in concentration, persistence, or pace. Mr.

Brooks argues that the ALJ erred in failing to consider how these limitations affected Mr. Brooks' ability to maintain pace to meet production requirements of work or his ability to persist at a task over a 40-hour work week. The government insists that the ALJ incorporated sufficient limitations by restricting Mr. Brooks to work with simple 1 and 2 step instructions, simple work-related decisions, a need for occasional reminders from supervisors, an ability to respond appropriately to occasional routine changes in the work place, and occasional interaction with the public, co-workers, and supervisors.

Where a claimant has moderate difficulties with concentration, persistence, and pace, the United States Fifth Circuit Court of Appeals has affirmed the ALJ's decision assessing the claimant with a residual functional capacity limiting the claimant to work requiring the claimant "to understand, remember, and carry out routine step instructions and respond appropriately to supervisors and coworkers in jobs that do not require independent decision making." Herrera v. Comm'r of Soc. Sec., 406 F. App'x 899, 902–04 (5th Cir. 2010) (unpublished); see Bordelon v. Astrue, 281 F. App'x 418, 422–23 (5th Cir. 2008) (holding that a restriction to work involving one to two step instructions, low stress, and with limited public interaction "reasonably incorporated [the claimant's] moderate concentration, persistence, and pace limitations."). District courts have also found that "an RFC limited to simple work reasonably incorporates a moderate or even *marked* limitation in concentration, persistence, or pace." Ricks v. Colvin, No. CIV.A. 12-2647, 2014 WL 333911, at *8 (W.D. La. Jan. 29, 2014); see Davis v. Astrue, No. CIV.A. 13-00065-BAJ, 2014 WL 4386367, at *4–5 (M.D. La. Sept. 4, 2014) (finding substantial evidence supported the ALJ's residual functional capacity assessment limiting the claimant to non-complex work where the claimant had moderately limited ability to maintain concentration, persistence, and pace); Reid v. Astrue, No. 3:10CV237 WHB-LRA, 2011 WL 4101302, at *9 (S.D. Miss. Aug. 15, 2011),

report and recommendation adopted, No. 3:10-CV-237-WHB-LRA, 2011 WL 4101277 (S.D. Miss. Sept. 8, 2011) (holding that the ALJ's "finding that Plaintiff's residual functional capacity was limited to simple instructions . . . was a reasonable incorporation of her moderate limitations in concentration, persistence, and pace.").

Here, Mr. Brooks argues that such restrictions are insufficient to account for a moderate limitation in concentration, persistence, and pace. For example, in Cruz v. Colvin, the court in the Southern District of Texas held that the ALJ erred where he found the claimant had moderate difficulties with concentration, persistence, and pace and moderate restriction in social functioning, but the residual functional capacity only limited the claimant to work requiring claimant to understand, remember, and carry out simple instructions, to carry out one to three step tasks that are routine and repetitive without frequent changes in duties, and with no contact with the public. No. CV H-15-3389, 2016 WL 8672925, at *2 (S.D. Tex. Dec. 28, 2016), report and recommendation adopted sub nom. Cruz v. Colvin, No. CV H-15-3389, 2017 WL 1274296 (S.D. Tex. Jan. 27, 2017). The court explained that the RFC failed to mention the claimant's limitation in ability to "concentrate over a period of time, his ability to persist at a task, or his ability to maintain a particular pace over the course of a workday or workweek." Id. The district court in Cruz determined that the Fifth Circuit had not decided a case with the same facts and noted that other circuits had done so and found reversible error. Id. ; see Varga v. Colvin, 794 F.3d 809, 814 (7th Cir. 2015) (quoting Yurt v. Colvin, 758 F.3d 850, 859 (7th Cir. 2014)) ("[W]e have repeatedly rejected the notion that a hypothetical like the one here "confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace."); Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015) (quoting Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011))

("[W]e agree with other circuits that an ALJ does not account "for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work."); Ramirez v. Barnhart, 372 F.3d 546, 554 (3d Cir. 2004) (finding that a restriction to "no more than simple one or two-step tasks" did not adequately account for the claimant's frequent "deficiencies in concentration, persistence, or pace"); Newton v. Chater, 92 F.3d 688, 695 (8th Cir. 1996) (holding that a hypothetical restricting the claimant to simple jobs was insufficient to account for a claimant's deficiencies in concentration, persistence, and pace, and noting that the vocational expert had testified that a moderate deficiency in those areas would cause problems on an ongoing daily basis regardless of the skill required). Mr. Brooks also cites Flores v. Berryhill, where the district court adopted the reasoning of the court in Cruz and reversed and remanded the ALJ's decision for further proceedings where the ALJ found that the claimant had moderate difficulties in concentration, persistence, and pace, but the ALJ's hypothetical to the vocational expert only included limitations to unskilled work without further mental limitations. No. CV H-17-30, 2017 WL 3412163, at *11 (S.D. Tex. Aug. 7, 2017).

The government argues that the limitations imposed by the ALJ here are appropriate, pointing to Herrera and Bordelon where the claimant had moderate concentration, persistence, and pace limitations and the Fifth Circuit, in unpublished decisions, affirmed restrictions like those imposed by the ALJ here. As noted above, in Herrera, the ALJ found the claimant had "mild restrictions in the activities of daily living, mild difficulties in social functioning, moderate difficulties with regard to concentration, persistence or pace" and included the following limitation in the claimant's residual functional capacity: "The claimant would be able to understand, remember, and carry out routine step instructions and respond appropriately to supervisors and coworkers in jobs that do not require independent decision making." 406 F. App'x at 902–04.

The court of appeals found that the ALJ's residual functional capacity assessment was supported by substantial evidence. Id.  In Bordelon, the ALJ limited the claimant to work involving one to two step instructions, low stress, and with limited public interaction. 281 F. App'x at 422–23. The court of appeals found these restrictions "reasonably incorporated [the claimant's] moderate concentration, persistence, and pace limitations." Id.  at 423.

The government insists that Mr. Brooks has failed to demonstrate what additional limitations the record warrants. The government points out that Mr. Brooks admitted in his Function Report that his impairments did not affect his ability to concentrate, understand, or follow instructions, and that he had a "good attention span," finished what he starts, and could follow spoken instructions. The government says that Mr. Brooks has had minimal treatment for mental problems and that the few mental examinations in the record reveal logical thought processes, fair memory, intellect, insight, and judgment, and normal concentration and attention.

Although Mr. Brooks was treating with mental health professionals for at least two years and was prescribed medication like oxcarbazepine and Seroquel, his treatment records do not indicate that Mr. Brooks required limitations beyond those assigned by the ALJ in assessing his residual functional capacity. At his March 2015, July 2015, September 2015, October 2015, and November 2016, appointments, his concentration was noted to be fair. His concentration was noted to be limited in June 2015. At that appointment his prescription was switched oxcarbazepine. Following that switch, Mr. Brooks appeared at his appointments with appropriate affect, euthymic mood, cooperative attitude, and fair concentration, memory, intellect, insight, and judgment, except for September 2015. But in September 2015, he had just been taken off of his psychiatric medications after being transported to the hospital with low blood pressure on September 13, 2015. Mr. Brooks' GAF scores showed improvement, ranging from 50 and 55 in March 2015, to 60 in

June 2015, to 65 in July and September 2015. A GAF score of 51 to 60 reflects "moderate symptoms" or "moderate difficulty in social occupational, or social functioning." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000). A GAF score of 61-70 reflects "some mild symptoms" or "some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well . . . ." Id.

The consultative psychologist determined that Mr. Brooks' concentration was within normal limits. She found that his ability to maintain attention and perform simple repetitive tasks for two-hour blocks of time would likely be fair. She found that his ability to understand, remember, and follow simple commands would likely be within normal limits. However, she found that his ability to persist at a normal pace over a 40-hour work week would likely be impaired. The ALJ accorded partial weight to the consultative opinion and determined that the limitations incorporated into the residual functional capacity assessment adequately accounted for the "opined limitations in social functioning and concentration, persistence or pace for a 40-hour work week." R. at 23. The ALJ added that "not only did the claimant tell the consultative psychologist that his main complaints were due to physical conditions, the treatment record also shows most treatment is for physical conditions." R. at 23. After considering the mental health evidence, the ALJ concluded that "the objective evidence of record supports a finding that the claimant can do simple work, sustain sufficient concentration, persistence, or pace, relate to others (fair) and his recent memory only mildly impaired." R. at 22.

In finding Mr. Brooks has moderate difficulties in concentration, persistence, or pace at Step 2, the ALJ noted the consultative examiner's finding that his recent memory is mildly impaired and he potentially has mild neurocognitive disorder. The ALJ considered Mr. Brooks' testimony that he can follow verbal instructions better than written ones and did not need special

reminders to care for personal needs or to take medication. The ALJ also noted that Mr. Brooks reported the ability to count change, handle a savings account, use a check-book, and handle money. The ALJ also noted that Mr. Brooks reported he does not need reminders or someone to accompany him. The ALJ further noted that Mr. Brooks reported a good attention span and the ability to finish tasks.

The Court finds that the limitations incorporated by the ALJ into Mr. Brooks' residual functional capacity appropriately address the evidence of Mr. Brooks' limitations in concentration, persistence, and pace. It is important here to look beyond the term "moderate restriction" as it may have been used in Cruz and Flores and to consider the actual evidence of limitations in Mr. Brooks' concentration, persistence, and pace relied on by the ALJ.[3] The evidence recited by the ALJ in making her findings regarding concentration, persistence, and pace accurately reflects the record. The only evidence that might support a finding of further limitations in persistence or pace seems to be the consultative examiner's opinion that Mr. Brooks' ability to sustain effort and persist at a normal pace over the course of a routine 40-hour work week would likely be impaired.  But in light of the records of Mr. Brooks' treating psychiatrists showing fair concentration with medication and an improving GAF score, there is substantial evidence to support the ALJ's finding that Mr. Brooks could "sustain sufficient concentration, persistence, or pace." By limiting Mr. Brooks to work requiring simple 1 to 2 step instructions, simple work-related decisions, an allowance for occasional reminders, and only occasional routine changes or interaction in the public, coworkers, and supervisors, the ALJ adequately incorporated limitations to address Mr.

---

[3] The court notes that although Mr. Brooks urges that Cruz and Flores represent the future of jurisprudence on moderate impairments to concentration, persistence, and pace, a court in the Middle District of Louisiana recently rejected the holding in Cruz and found that Bordelon and the district cases following it were persuasive. See Jackson v. Astrue, No. CV 16-479-JJB-RLB, 2017 WL 3996437, at *5 (M.D. La. Aug. 2, 2017), report and recommendation adopted, No. CV 16-479-JJB-RLB, 2017 WL 3996414 (M.D. La. Sept. 11, 2017). While Cruz and Flores may be instructive in an appropriate case, here, the limitations imposed by the ALJ are supported by substantial evidence.

Brooks' impairments in concentration, persistence, and pace. Cases like <u>Bordelon</u>, <u>Herrera</u>, <u>Ricks</u>, <u>Davis</u>, and <u>Reid</u>, are consistent with this conclusion. Accordingly, the court finds that the ALJ's residual functional capacity assessment is supported by substantial evidence.

**RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 19) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 20) be GRANTED.

**OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 28th day of December, 2018.

Janis van Meerveld
United States Magistrate Judge
